UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALPS SOUTH, LLC, a Florida limited
liability company,

       Plaintiff

and

APPLIED ELASTOMERICS,
INCORPORATED, a California corporation,

      Rule 19 Involuntary Plaintiff,

v.                                                                           Case No.

THE OHIO WILLOW WOOD
COMPANY, an Ohio corporation,

      Defendant.
_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Alps South, LLC, ("Alps") sues Involuntary Plaintiff Applied Elastomerics, Incorporated ("AEI") and Defendant, The Ohio Willow Wood Company, ("OWW"), and states as follows:

### NATURE OF ACTION

1. This is an action for patent infringement under the United States Patent Law, 35 U.S.C. § 271 et. seq.

### PARTIES

2. Alps is a Florida limited liability company with its principal place of business in St. Petersburg, Florida. Alps is engaged in the business of manufacturing and selling prosthetic liners for use by customers who have prosthetic limbs.

3. AEI is a California corporation within its principal place of business in South San Francisco, California.

4. OWW is an Ohio corporation with its principal place of business in Mt. Sterling, Ohio. OWW is engaged in the same type of business as, and is a competitor of, Alps.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

6. AEI is subject to jurisdiction in Florida because it has engaged in business in the State of Florida and has engaged in substantial and not isolated activity within the State of Florida.

7. OWW is subject to jurisdiction in Florida because it has engaged in business in, or has an office in, the State of Florida; is engaged in substantial and not isolated activity within the State of Florida; and/or has committed acts of infringement in the State of Florida.

8. Venue is proper in this district and in this division under 28 U.S.C. §§ 1391(c) and 1400.

## THE PATENTS AT ISSUE

9. On March 8, 1996, John Y. Chen filed a patent application with the United States Patent and Trademark Office (the "USPTO") claiming an invention entitled "Gelatinous Elastomer Compositions and Articles," which application was assigned Serial No. 08/612,586. The inventions disclosed and claimed in the application were assigned to AEI, a corporation formed and owned by Mr. Chen and his wife.

10. On November 21, 2000, Mr. Chen filed a patent application with the USPTO

claiming an invention entitled "Tear Resistant, Crystalline Midblock Copolymer Gels and Articles," which application was assigned Serial No. 09/721,213. The inventions disclosed and claimed in the application were assigned to AEI.

11. On April 22, 2003, United States Patent No. 6,552,109 B1 (the "'109 Patent") was duly, validly, and legally issued to Mr. Chen on behalf of his assignee, AEI, based on Serial Number 08/612,586. A true and correct copy of the '109 Patent is attached hereto as Exhibit 1.

12. On March 15, 2005, United States Patent No. 6,867,253 B1 (the "'253 Patent") was duly, validly, and legally issued to Mr. Chen on behalf of his assignee, AEI, based on Serial Number 09/721,213. A true and correct copy of the '253 Patent is attached hereto as Exhibit 2.

13. On September 16, 2009, OWW filed an *ex parte* request to reexamine the '109 Patent. OWW's request resulted in an Ex Parte Reexamination Certificate being issued on July 5, 2011. A true and correct copy of the '109 Patent Reexamination Certificate is attached hereto as Exhibit 3.

14. On January 29, 2010, OWW filed an *ex parte* request to reexamine the '253 Patent. The USPTO denied OWW's request on February 3, 2010.

15. On May 28, 2010, OWW filed a second *ex parte* reexamination request regarding the '253 Patent. OWW's request resulted in an Ex Parte Reexamination Certificate being issued on June 7, 2011. A true and correct copy of the '253 Patent Reexamination Certificate is attached hereto as Exhibit 4.

16. On July 26, 2011, a Certificate of Correction was issued regarding the '253 Patent to correct minor mistakes in the '253 Patent Reexamination Certificate. A true and correct copy of the '253 Certificate of Correction is attached hereto as Exhibit 5.

17. On December 7, 2012, OWW filed a second request for *ex parte* reexamination of

the '109 Patent. The USPTO denied OWW's request on July 8, 2013.

18. The '109 Patent expired on August 11, 2014.

19. The '253 Patent expired on May 7, 2015.

20. The '109 Patent and '253 Patent are collectively referred to in this Complaint as the "Patents."

## BACKGROUND

21. On August 31, 2008, AEI granted an exclusive field-of-use license to Alps pursuant to a Patent Sale and License Agreement.

22. On September 23, 2008, Alps filed a Complaint and Demand for Jury Trial, Injunctive Relief Sought alleging OWW was infringing the Patents. The case was assigned Case Number 8:08-CV-1893 (the "1893 Case").

23. OWW filed a counter-claim in the 1893 Case alleging, *inter alia*, that the Patents were invalid and unenforceable.

24. On January 28, 2010, AEI and Alps amended the Patent Sale and License Agreement *nunc pro tunc* to the date of the original agreement, August 31, 2008, to convey any substantial rights that AEI may have retained under the original August 31, 2008 Patent Sale and License Agreement.

25. Alps filed Supplemental Complaint in the 1893 Case [Dkt. 185] alleging, at Paragraph 16, that AEI granted an exclusive license to Alps under the Patents pursuant to Patent Sale and License Agreement. OWW filed an answer in the 1983 Case [Dkt. 192] alleging: "Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 16 of the Supplemented Second Amended Complaint and, therefore, denies the same." OWW also asserted in the 1983 Case [Dkt. 192], an affirmative defense: "As a

second affirmative defense, OWW alleges that Plaintiff lacks standing to bring the present suit against it."

26. Based upon OWW's second affirmative defense asserted in the 1983 Case, upon information and belief, OWW will contend that Alps lacks standing to assert infringement of the Patents without the joinder of AEI as a co-plaintiff. AEI has been requested to voluntarily join as a co-plaintiff in this action, but has refused. Therefore, Alps joins AEI as an involuntary co-plaintiff pursuant to Rule 19, Federal Rules of Civil Procedure.

27. During the course of the 1893 Case, a substantial amount of discovery was exchanged by both parties, numerous corporate, expert and third party depositions were taken, a claim construction hearing was completed, summary judgment motions were filed and decided and a two-week jury trial was held commencing on April 30, 2012.

28. As a result of the trial, the jury found that OWW infringed claims 1-3, 5, 6, 11 and 12 of the '109 Patent, that these claims were not invalid, and that OWW's infringement was willful. It awarded Alps $3,983,512 in compensatory damages. *See* 1893 Case, Dkt. 294.

29. Following the jury's verdict of willful infringement, OWW continued to willfully infringe the Patents by continuing to make, use, offer for sale, and sell infringing products, including the products that were adjudicated to infringed the '109 Patent.

30. In or around November 2012, OWW began making, using, offering for sale, and selling prosthetic liners utilizing a gel formulation that OWW referred to as its "advanced formula" (hereinafter the "Advanced Gel Products"). *See* Exhibit 6, December 10, 2012 Press Release.

31. OWW's manufacture, use, offer for sale, and sale of the Advanced Gel Products infringed Alps's Patents.

32. On May 9, 2013, the court permanently enjoined OWW from making, using, selling or offering to sell, or importing into the United States any products that infringe claims 1-3, 5, 6, 11 and 12 of the '109 Patent. That same day, the court also entered an order that doubled the damages award and granted Alps's requests for supplemental damages and entitlement to attorneys' fees. *See* 1893 Case, Dkts. 418, 420, 422.

33. In or around November 2013, the court held OWW in contempt for its manufacture, use, offer for sale, or sale of infringing products, including the Advanced Gel Products, following entry of the permanent injunction. The court found that the Advanced Gel Products were no more than colorably different from the products adjudicated to infringe the '109 Patent. *See* 1893 Case, Dkt. 504.

34. On March 6, 2014, the Court entered a Third Amended Final Judgment awarding enhanced damages of $7,967,024.00 plus prejudgment interest and post-judgment interest, supplemental damages in the amount of $2,932,239.30, and costs in the amount of $86,992.71. The court also awarded Alps its attorneys' fees. The court also entered a separate judgment based on the contempt order concerning OWW's sales of Advanced Gel Products that awarded Alps additional damages of $4,560,617. *See* 1893 Case, Dkts. 577-78.

35. Thereafter, both Alps and OWW filed appeals of various issues. Most notably, OWW appealed two orders holding that Alps had standing to pursue the 1893 Case. OWW argued to the United States Court of Appeals for the Federal Circuit that at the time the 1893 Case was filed Alps did not own all substantial rights in the Patents, and therefore did not have standing to file suit and the court did not have jurisdiction to hear the case. The Federal Circuit agreed with OWW, and it reversed the judgment and ordered the 1893 Case to be dismissed without prejudice.

## OWW's WILLFUL MISCONDUCT

36. Prior to the issuance of the '109 and '253 Patents, Mr. Chen had multiple telephone conversations and exchanged multiple written correspondences with Robert Arbogast, OWW's then president, and James Colvin, OWW's current Director of Engineering, regarding OWW obtaining a license to AEI's earlier patents involving gels and composites.

37. Prior to the issuance of the '109 and '253 Patents, OWW was also aware that Silipos, a competing prosthetic liner and gel manufacturer, was manufacturing and selling products under a patent license from AEI.

38. By 1997, AEI had developed the invention claimed in the Patents and had filed his patent application for the '109 Patent on March 8, 1996.

39. In a letter dated November 14, 1997, Mr. Arbogast expressed OWW's "possible interest" in AEI's "new generation thermoplastic elastomer that has a fatigue life approximately three times greater than other elastomers of a similar classification presently commercially available" and asked for a draft license. *See* Exhibit 7, Nov. 14, 1997 Letter from Arbogast to Chen. The parties continued to communicate following the November 14, 1997 letter, but OWW declined to enter a license with AEI.

40. On September 14, 2000, Mr. Chen, on behalf of AEI, wrote Mr. Arbogast regarding OWW's need to take a license for newer gel composites that were the subject of pending patent applications, including the patent application that issued as the '109 Patent. A copy of the September 14, 2000 letter is attached as Exhibit 8.

41. Approximately a month after the '109 Patent issued, on May 15, 2003, AEI sent OWW another letter providing notice that the '109 Patent had issued. The May 15, 2003 letter also notified OWW that Chen and AEI had tested OWW's products and that OWW's product

appeared to be infringing. A true and correct copy of the May 15, 2003 letter is attached hereto as Exhibit 9.

42. OWW did not take a license to the '109 or '253 Patents. In fact, Mr. Colvin recommended to Mr. Arbogast that OWW do nothing in response to AEI's inquiries regarding a potential license to the Patents.

43. On June 9, 2003, Mr. Colvin wrote AEI a letter that again expressed possible interest in a license to patents such as the '109 Patent. A true and correct copy of the June 9, 2003 letter is attached hereto as Exhibit 10.

44. On September 18, 2003, Mr. Chen, on behalf of AEI, again followed up on OWW's interest in writing expressing the need for OWW to take a license. A true and correct copy of the September 18, 2003 letter is attached hereto as Exhibit 11.

45. Finally, about 7 years after Mr. Chen's initial letter, on October 12, 2004, Mr. Colvin wrote Mr. Chen a letter informing him that the OWW did not believe it needed a license. A true and correct copy of the October 12, 2004 is attached hereto as Exhibit 12.

46. Although Mr. Chen wrote to OWW a few more times asking for the justification for OWW's position regarding a license, OWW refused to respond. True and correct copies of Mr. Chen's November 15, 2004, February 1, 2005 and May 25, 2005 letters are attached hereto as Exhibit 13.

47. Mr. Chen also had multiple calls with OWW. In the last call, OWW made it clear that OWW was not at all interested in continuing discussions with Mr. Chen.

48. During the trial in the 1893 Case, Mr. Arbogast admitted that OWW's Alpha line of prosthetic liner products infringed at least claim 1 of the '109 Patent. At the trial, Mr. Arbogast testified substantially as follows:

Q. Isn't it correct that the Alpha Liner infringes this Claim 1 of the 109 Patent?

A. I'm not sure. Does that mean that—in order to infringe it would have to infringe on every one of these, correct?

Q. That is correct, sir.

A. It appears to.

*See* Exhibit 14, May 3, 2012 Trial Tr. at 31:6-11.

49. Mr. Arbogast further testified that he received notification from AEI specifically regarding the '109 Patent on May 15, 2003, less than a month after the patent's issuance. When asked what he did after receiving this letter, Mr. Arbogast testified, "I didn't do anything."

50. In the Reexaminations mentioned above, OWW argued that claims of the Patents were invalid as obvious and anticipated and submitted numerous pieces of prior art in support of its argument. The USPTO examined all of OWW's arguments and the prior art submitted, and issued Reexamination Certificates on the Patents in which the existing claims reissued with minor amendments and in which new claims were allowed.

51. Even after the reexamination certificates issued for these patents in June and July 2011, confirming their validity, OWW continued to manufacture and sell products that infringe claims of the '109 and '253 Patents.

52. Following entry of a permanent injunction in the 1983 Case, on or about May 10, 2013, OWW issued a press release encouraging its customers to continue using and selling the products adjudicated to infringe the '109 Patent. *See* Exhibit 15, May 10, 2013 Press Release.

53. With regard to the Advanced Gel Products, Mr. Colvin admitted during a November 7, 2013 contempt hearing that the Advanced Gel Products infringed the '109 Patent:[1]

---

[1] OWW considers one component of the Advanced Formula to be confidential, so reference to that component has been omitted.

> THE WITNESS: Because if that were the interpretation that it could be potentially just a speck of SEEPS.
>
> THE COURT: And if that's what it means, and your "advance" gel formula has 4033 and the ****** gel, would it infringe Claim 1 of the patent if that's what it means?
>
> THE WITNESS: Yeah. It seems like it would—that would be the case.

*See* Exhibit 16, Nov. 7, 2013 Hrg. Tr. at 190:8-13.

## CLAIM FOR PATENT INFRINGEMENT

54. Alps incorporates and re-alleges the allegations and facts set forth in paragraphs 1 through 50 as if fully set forth herein.

55. On information, belief and admission, OWW was infringing one or more of the claims of the Patents in violation of 35 U.S.C. § 271(a) by:

   (a) making, importing, using, offering to sell, and/or selling in this judicial district, and elsewhere in the United States, products which embody the inventions claimed in the Patents; and/or

   (b) actively inducing others to infringe the Patents; and/or

   (c) contributing to the infringement of the Patents.

56. OWW's actions with respect to the Patents are without authority or license from Alps.

57. OWW was making, importing, using, offering to sell, and/or selling products that infringe the Patents without a license from Alps.

58. OWW infringed at least claims 1-3, 5-6, 11-12, and new claims 13-16 of the '109 Patent set forth in the Reexamination Certificate of July 5, 2011.

59. OWW also infringed at least claims 1-5, 7, 10-12, and new claims 18-20 of the '253 Patent set forth in the Reexamination Certificate of June 7, 2011.

60.     Alps retained Jerry L. Atwood, Ph.D., an expert in the fields of polymer chemistry, crystal growth, crystal engineering, organic chemistry and inorganic chemistry to perform testing on OWW's gel products which included the Alpha FLEX SLEEVE Suction Seal, Alpha Socket Pad, Alpha AK Suction Seal, Alpha MAX Cushion Liner, Alpha P-POD Cushion Liner, Alpha ORIGINAL Cushion Liner, Alpha SPIRIT Cushion Liner, Alpha UE Locking Liner, Alpha AK Cushion Liner, Alpha SPIRIT CUFF Suction Seal, Alpha ORIGINAL SUCTION LINER, Alpha DESIGN AK Liner and Alpha DESIGN BK Liner. Upon information and belief, OWW has also private labeled infringing liners known as 6Y93 Liner for Otto Bock Healthcare d/b/a OttobockOtto or one or more of its subsidiaries (see http://www.ottobock.com/en/company/locations/ last visited 1/4/16). The aforementioned products are collectively referred to as "Products."

61.     Dr. Atwood opined in a July 26, 2010 declaration that OWW's Products met each element of claims 1-6 and 11-12 of the '109 Patent as well as claims 1-5, 7-8, 10-12, and 14-17 of the '253 Patent, as originally issued.

62.     Following reexamination of both Patents, Dr. Atwood provided a Supplemental Declaration dated October 12, 2011 stating essentially that his conclusion regarding whether OWW's Products met the limitations of the '109 and '253 Patents were unchanged by the reexamination.

63.     Claim 1 of the '109 Patent can be broken down into 14 elements. OWW previously admitted in the 1893 Case that its Products encompass the following elements:

Element 1)   A composite article comprising

Element 2)   a thermoplastic,

Element 3)   heat formable

Element 5)   gelatinous elastomer composition, G,

64.   Element 4 of claim 1 of the '109 Patent states "and heat reversible." OWW's gel composition is heat reversible.

65.   Element 6 of claim 1 of the '109 Patent states that the gelatinous elastomer composition "is formed into a composite by heat and physically interlocked with one or more of a selected substrate material, M." OWW's gels are composed of a plasticizing oil and a SEEPS polymer. The combination of plasticizing oil and SEEPS polymer is a gelatinous elastomer composition. The OWW products are formed into a composite of a gel and a fabric by heat, and OWW has admitted that it used heat in this process.

66.   Element 7 of claim 1 of the '109 Patent states "said gelatinous elastomer composition formed from (i) 100 parts by weight of one or a mixture of two or more of a hydrogenated styrene isoprene/butadiene block copolymers(s) comprising poly(styrene-ethylene-ethylene-propylene-styrene)." Infrared spectroscopic and other testing of OWW's Products by Dr. Atwood revealed that the Product gels contain a mixture of 100 parts by weight of two or more of a hydrogenated styrene isoprene/butadiene block copolymer(s). OWW has admitted to using Septon 4033, 4044, 4055 and 4077 in its products, which are copolymers of the structure poly(styrene-ethylene-ethylene-propylene-styrene) and are hydrogenated styrene isoprene/butadiene block copolymers.

67.   Element 8 of claim 1 of the '109 Patent states that the gelatinous elastomer composition is formed "from (ii) about 300 to about 1,600 parts by weight of a plasticizing oil." OWW's stated in its response to Alps' Infringement Contentions filed in the 1893 Case that its Products contain between 300 and 1,600 parts by weight mineral oil. Mineral oil is a plasticizing oil.

68. Element 9 of claim 1 of the '109 Patent states:

"in combination with or without

(iii) a selected amount of one or more polymers or copolymers of poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene-styrene) $_n$, poly(styrene-isoprene) $_n$, poly(styrene-ethylene-propylene), poly(styrene-ethylene-propylene-styrene), poly(styrene-ethylene-butylene-styrene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene, wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer wherein n is greater than one;"

This element of the claim uses the language "with or without," and it is considered non-limiting. OWW's Products do not include the additional polymers or copolymers, and thus are "without" a selected amount of one or more of the polymers or copolymers.

69. Element 10 of claim 1 of the '109 Patent states "wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer." Like element 9, this element is non-limiting, but in any event, the copolymers used by OWW are linear, radial, star-shaped, branched, or multi-arm.

70. Element 11 of claim 1 of the '109 Patent states "wherein n is greater than one."

71. Element 12 of claim 1 of the '109 Patent states "wherein said composite formed from the combination $G_nM_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nM_nG_nM_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $G_nG_nM_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nG_nG_n$, $G_nM_nM_nG_n$, $G_nG_nM_nM_n$, $G_nG_nM_nG_nM_n$, $G_nM_nG_nM_nM_n$, $M_nG_nM_nG_nM_nG_n$, $G_nG_nM_nM_nG_n$, $G_nG_nM_nG_nM_nG_n$, a sequential addition or a permutation of one or more of said $G_n$ with $M_n$."

72. Element 13 of claim 1 of the '109 Patent states "wherein when n is a subscript of M, n is the same or different selected from the group consisting of foam, plastic, fabric, metal, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials."

73. The Products tested by Dr. Atwood were of the form GM or MGM with the subscript of M being equal to one (1) and M being a fabric. The limitations of claim elements 11 through 13 are, thus, met by OWW's Products.

74. Element 14 of claim 1 of the '109 Patent states "and wherein when n is a subscript of G, n denotes the same or a different gel rigidity." This language allows for "the same or a different" gel rigidity and is non-limiting.

75. Claim 1 of the '253 Patent can be broken down into 13 elements. OWW previously admitted in the 1893 Case that OWW's products constitute a composite, which is element 1 of claim 1.

76. Element 2 of claim 1 of the '253 Patent states the composite comprises "a gel denoted by G, being formed by heat into a composite in physical contact with a selected material M." Dr. Atwood's testing led him to conclude that OWW Products consist of a gel in physical contact with a fabric. OWW has admitted that its Products were formed using heat.

77. Element 3 of claim 1 of the '253 Patent states that the composite forms "the combination $G_nM_n$, $G_nM_nG_n$, $M_nG_nM_n$, $M_nG_nG_nM_n$, $G_nM_nM_nG_n$, $G_nM_nG_nM_nG_n$, $M_nM_nM_nG_n$, $M_nM_nM_nG_nM_nM_nM_n$ or a permutation of one or more of said $G_n$ with $M_n$."

78. Element 4 of claim 1 of the '253 Patent states that "n is a subscript of M, n is the same or different selected from the group consisting of paper, foam, plastic, fabric, metal, metal foil, concrete, wood, glass, ceramics, synthetic resin, synthetic fibers or refractory materials." The Products tested by Dr. Atwood were of the type GM or MGM with M being a fabric.

79. Element 5 of claim of the '253 Patent states "and wherein when n is a subscript 1of G, n denotes the same or a different gel rigidity." This language allows for "the same or a different" gel rigidity and is nonlimiting.

80. Element 6 of claim 1 of the '253 Patent states:

"said gel comprising: (i) 100 parts by weight of one or more block copolymers selected from poly(styrene-ethylene-ethylene-butylene-styrene), poly(styrene-ethylene-ethylene-propylene-styrene), poly(styrene-ethylene-ethylene-butylene$_{25}$-styrene), poly(styrene-ethylene-propylene-ethylene-styrene), poly(styrene-ethylene-ethylene-butylene)$_n$,; or mixtures thereof, wherein subscript n is two or more."

OWW has admitted to using copolymers of the structure poly(styrene-ethylene-ethylene-propylene-styrene), or "SEEPS," and the Products therefore meet the limitation of element 6.

81. Element 7 of claim 1 of the '253 Patent states "(ii) about 300 to about 1,600 parts by weight of one or more plasticizing oils." Thermogravimetric and/or other testing by Dr. Atwood proved that OWW's Products contain about 400 parts by weight of plasticizing oil, and the limitations of this element are met.

82. Element 8 of claim 1 of the '253 Patent states "with a selected amount of at least one said plasticizing oil(s) having a viscosity greater than 4 cSt at 40° C." Viscosity testing by Dr. Atwood showed that the oil used in OWW's Products has a viscosity of more than 4 cSt at 40° C.

83. Element 9 of claim 1 of the '253 Patent states "said gel characterized by a gel gram Bloom of about 2 gram to about 1,800 gram Bloom." Dr. Atwood's testing also showed that OWW's Products have a gel rigidity within the range of about 2 to about 1,800 gram Bloom.

84. Element 10 of claim 1 of the '253 Patent states:

"and in combination with or without (iii) a selected amount of one or more polymers or copolymers comprising poly(styrene-butadiene-styrene), poly(styrene-butadiene)$_n$, poly(styrene-isoprene)$_n$, poly(ethylene-styrene), poly(styrene-ethylene-propylene), poly(styrene-ethylene-butylene), poly(styrene-ethylene-propylene)$_n$, poly(styrene-ethylene-butylene)$_n$, polystyrene, polybutylene, poly(ethylene-propylene), poly(ethylene-butylene), polypropylene, or polyethylene."

This element of the claim uses the language "with or without," it is considered

nonlimiting. OWW's Products do not include the additional polymers or copolymers, and thus are "without" a selected amount of one or more of the polymers or copolymers.

85. Element 11 of claim 1 of the '109 Patent states "wherein said selected copolymer is a linear, radial, star-shaped, branched or multiarm copolymer." Like element 10, this element is non-limiting, but in any event, the copolymers used by OWW are linear, radial, star-shaped, branched, or multi-arm.

86. Element 12 of claim 1 of the '109 Patent states "wherein n is greater than one." Like element 10, this element is nonlimiting.

87. Element 13 of claim 1 of the '253 Patent states:

> "said gel having greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers." The gel used in OWW's Products has a greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers.

The gel used in OWW's products have a greater tear resistance than gels having corresponding rigidity made from a poly(styrene-ethylene-butylene-styrene) or poly(styrene-ethylene-propylene-styrene) block copolymers.

88. Dr. Atwood also tested and analyzed OWW's Advanced Gel Products. Dr. Atwood opined that the Advanced Gel Products continued to infringe the '109 Patent.

89. OWW's Advanced Gel Products were still composite articles comprised of a thermoplastic, heat formable and reversible gelatinous elastomer composition which are formed into a composite by heat and physically interlocked with a fabric substrate.

90. OWW's Advanced Gel Products were formed from 100 parts by weight of one or a mixture of two or more hydrogenated styrene isoprene butadiene block copolymer(s)

comprising a poly(styrene-ethylene-ethylene-propylene-styrene) and from about 300 to 1600 parts by weight of plasticizing oil.

91. OWW's Advanced Gel Products substituted a block copolymer known as ****** for a SEEPS block copolymer, known as Septon 4055, that was the principal block copolymer used by OWW in manufacturing the 13 products that Mr. Arbogast admitted infringed claim 1 of the '109 Patent.[2]

92. The substituted block copolymer is indisputably a hydrogenated styrene isoprene butadiene block copolymer, and therefore the new "advanced gel" was still comprised of SEEPS.

93. The formula contained Septon 4033, which is indisputably a SEEPS block copolymer. The ratio of hydrogenated styrene isoprene butadiene block copolymer to plasticizing oil remained in the range set forth in claims 1-3 of the '109 Patent.

94. OWW's conduct as described and evidenced in this Complaint has been willful.

95. OWW is engaged in the same type of business as, and is a competitor of, Alps. Both OWW and Alps manufacture, use, market, and sell prosthetic liner products, including, but not limited to, prosthetic liner products made with block copolymer gels.

96. OWW and Alps both market and sell prosthetic liner products through the same or similar channels of commerce, including direct sales to prosthetists and sales through distributors, such as Cascade Orthopedic Supply, Inc.; PEL LLC; and Southern Prosthetic Supply Co. ("SPS").

97. As a direct and proximate result of OWW's infringement of the Patents, Alps suffered irreparable harm and impairment of the value of its licensed patent rights, has experienced loss of sales to its existing and potential customers, has lost the goodwill of its

---

[2] OWW considers one component of the Advanced Formula to be confidential, so reference to that component has been omitted.

customers, and has suffered a violation of its licensed patent rights.

98. Alps has been damaged in an amount to be determined at trial.

WHEREFORE, Alps demands judgment:

(a) Finding that OWW has been infringing, contributing to the infringement of and inducing infringement of the Patents;

(b) Finding the infringement to be willful;

(c) Ordering an accounting of and awarding Alps such damages, lost profits, royalties, attorneys' fees, costs, prejudgment interest, and enhanced damages as may be shown by the evidence;

(d) Finding this to be an exceptional case under 35 U.S.C. § 283 and awarding Alps its reasonable attorneys' fees under 35 U.S.C. § 285; and

(e) Awarding Alps such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Alps hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

_____
Stefan V. Stein
Florida Bar No. 300527
Trial Counsel
Cole Y. Carlson
Florida Bar No. 112863
GrayRobinson, P.A.
401 E. Jackson Street, Suite 2700
Tampa, FL 33602
Tel: 813/273-5000
Fax: 813/273-5145
stefan.stein@gray-robinson.com
cole.carlson@gray-robinson.com

*Attorneys for Plaintiff, Alps South, LLC*

# 6303646 v1